**UNITED STATES of America, Appellee,**

v.

**Jeffrey SCHNEIDER, Defendant–Appellant.**

**No. 03–1764.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 1, 2004.

Decided: Jan. 14, 2005.

As Amended Feb. 9, 2005.

Paula Schwartz Frome, Esq. (Kase & Druker, Esqs., on the brief), Garden City, NY, for Defendant–Appellant.

Demetri M. Jones, Esq. (Jo Ann M. Navicaks, Esq., on the brief), United States Attorney's Office, Central Islip, NY, for Appellee.

Before: LEVAL and KATZMANN, Circuit Judges.[1]

KATZMANN, Circuit Judge.

After multiple proffer sessions and negotiations concerning a possible deferred prosecution or dismissal, Jeffrey Schneider was tried in 2002 on charges of fraud. Despite the testimony of several witnesses that Schneider was involved in the fraudulent scheme, he was acquitted. Schneider then moved for attorney's fees and expenses under the Hyde Amendment, which permits such an award where "the position of the United States was vexatious, frivolous, or in bad faith." Pub.L. No. 105–119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes). The district court denied the motion, and the instant appeal ensued.

This case presents questions of first impression for the Second Circuit. Specifically, we are called upon to analyze when a court may deny a Hyde Amendment motion for attorney's fees and expenses, and when an evidentiary hearing or other compulsion of evidence is warranted under the Hyde Amendment.

## BACKGROUND

In January 2002, defendant-appellant Jeffrey Schneider was charged in a two-count indictment with conspiracy to defraud the government, in violation of 18 U.S.C. § 371, and wire fraud, in violation of 18 U.S.C. § 1343. The charges stemmed from a multi-million dollar fraud scheme by principals and officers of Island Mortgage Network, Inc. ("IMN"), a mortgage bank in Melville, New York.

### A. The Scheme

Evidence introduced at trial supported the following. IMN originated and arranged funding for residential loans. Warehouse lenders usually funded 95%–98% of the total loan amount, and IMN was supposed to fund the remaining portion, also referred to as a "haircut." The undisclosed principal of IMN, Paul Skulsky, a convicted felon, conceived of a scheme whereby IMN monies would not be used to fund the haircut. Instead, funds that had been deposited into escrow accounts by the warehouse lenders to fund the loans were illegally diverted to pay IMN's operating expenses and to fund IMN's contributions to the loans. This was achieved by taking advantage of the time between when the warehouse lenders'

---

[1] The Honorable Ellsworth Van Graafeiland, Judge, United States Court of Appeals for the Second Circuit, was part of this panel, but died following argument. The appeal is being decided by the remaining two members of the panel, who are in agreement. *See* 2d Cir. R. § 0.14(b).

money was deposited in IMN's escrow accounts and when the checks drawn off of those funds would clear. Money sitting in the escrow account during this time, known as the "float," was used to fund IMN's haircut contribution. Cindy Eisele, the Chief Financial Officer at IMN, diverted the float into the operating accounts at Skulsky's direction.

Joseph Casuccio, a certified public accountant and partner with the accounting firm of Werblin, Casuccio & Moses ("Werblin"), was IMN's independent outside auditor. Casuccio supervised Werblin's three-member accounting team that prepared IMN's periodic audits and statements from 1998 until 2000. Schneider, a CPA who joined Werblin in late 1998, was a member of that team. After Casuccio discovered discrepancies in IMN's books and questioned Skulsky about them, Skulsky expressed his desire not to disclose the debts that had been created by the diversion of funds from the escrow accounts. Casuccio then conceived of a plan to disguise the growing deficit in the escrow accounts on IMN's statements by reporting it in a footnote as a debt owed by related parties to the Skulsky Trust. Although the Skulsky Trust was a genuine entity, it had minimal assets.

In late 1999, with the escrow account liability having grown substantially—it would reach $30 million by 2000—Casuccio decided to withdraw as IMN's independent auditor. Skulsky asked Casuccio to find a replacement accounting firm and Casuccio asked Schneider if he knew of a firm that might take IMN as a client. In December 1999 Schneider contacted Aaron Chaitovsky, a partner at Citrin Cooperman ("Citrin"), where Schneider had worked prior to joining Werblin, and proposed that Citrin take on the IMN account. Once Citrin was formally engaged in January 2000, Schneider and his two audit assistants remained at IMN to assist with the transition and help close out the books, although according to Schneider, Casuccio specifically told the Werblin team that they "were not to be engaged in the practice of auditing." During this transition, Schneider discussed with Citrin accountants the debt owed to the escrow account, and the use of the Skulsky Trust to disguise the debt.

Eventually, the United States Attorney's Office and the FBI began an investigation. Casuccio, Eisele, Skulsky and others engaged in proffer sessions with the United States Attorney, pled guilty to fraud charges, and agreed to cooperate. Prior to his testimony at Schneider's trial, the government apparently granted Chaitovsky a deferred prosecution agreement. Schneider maintained his innocence.

## B. Pre-Trial Proceedings

Assistant U.S. Attorney Jodi Avergun (AUSA) oversaw the investigation into IMN's illegal activities from July 2000 until January 2002. Schneider and his counsel, James Druker, agreed to a proffer session on December 22, 2000. Prior to the session, Avergun faxed Druker a copy of a proffer agreement. Druker informed Avergun that it contained some objectionable language, and according to Druker, Avergun stated that she would address his concerns at the meeting.

The December 22, 2000 proffer session was contentious. The following is Druker's account. Initially, he asked Avergun for confirmation of what he had been told by an FBI case agent—that Schneider was considered a fact witness. Avergun responded that he was a target or subject. Druker objected again to the proffer agreement; Avergun answered that the language was "required" by the Second Circuit. Druker stated that he could not allow Schneider to participate under those

terms, and then asked if Schneider would be a candidate for immunity; Avergun replied that he could not be so considered unless she spoke to him first. She refused Druker's offer of an attorney proffer. Avergun stated that she would subpoena Schneider to appear before the Grand Jury, and Druker asserted that, if subpoenaed, Schneider would assert his Fifth Amendment privilege. Druker claims that Avergun retorted, "If he takes the Fifth Amendment, we will indict him." After an additional acrimonious exchange, followed by Avergun "grabb[ing] the proffer agreement from [Druker's] hand and again point[ing] to the door," Avergun addressed Schneider, stating, "I want to say one thing to you, Mr. Schneider. I think that your attorney is making a very big mistake here." Druker interjected that it was inappropriate for Avergun to address his client directly. Later that day, Druker faxed a letter memorializing his memory of the meeting to Avergun, stating that he would accept service of the grand jury subpoena on Schneider's behalf. He also wrote a letter to the Chief AUSA in Central Islip, George Stamboulidis, enclosing the letter he had sent to Avergun.

On December 27, 2000, Avergun responded to Druker's letter, stating that FBI agents had left her office on December 22 with the subpoena to serve on Schneider. She termed Druker's account of the proffer session "incorrect in several respects." She maintained that she had not threatened to prosecute Schneider if he took the Fifth Amendment before the grand jury, but that any prosecution would stem from aiding and abetting mail fraud and securities fraud "in which [he] appears to have engaged." Avergun further claimed that she had told Druker that if Schneider did not wish to proffer, she would subpoena him and that an indictment could follow. She added that she was "certain" that she did not say that an indictment would "follow *as a result of* Mr. Schneider's asserting his right against self-incrimination." *Id.* (emphasis in original). She named two cases, without citation, *United States v. Fagey* and *United States v. Raymond Cruz*, as authority for the language used in the objected-to proffer agreement, and apologized for speaking directly to Schneider.[2]

Apparently, the subpoena was eventually served on Druker rather than Schneider. On January 3, 2001, Druker wrote to Avergun inquiring whether Schneider's personal appearance before the grand jury would be necessary, given that he would assert his Fifth Amendment privilege. Receiving no response, Druker wrote to Stamboulidis, with the same request. Schneider's grand jury appearance was then cancelled.

The case remained dormant for almost a year. Then, in January 2002, Druker wrote the new Chief AUSA in Central Islip, Joseph Conway, observing that the case appeared to be "heating up again," and requesting a conference. On January 18, 2002, Druker met with Avergun and Jonathan Sack, the Chief of the Criminal Division, and was told that he would receive an answer shortly concerning Schneider's possible indictment. On January 30, 2002, Schneider was indicted; shortly thereafter, Avergun left to assume a Justice Department post and new prosecutors were assigned to the IMN case.

---

2. The government was apparently referring to *United States v. Cruz*, 156 F.3d 366 (2d Cir. 1998) and *United States v. Fagge*, 101 F.3d 232 (2d Cir.1996), two cases in which the Second Circuit permitted use at sentencing of information disclosed in proffer sessions. A search of the electronic legal databases returns no case in federal or state court captioned *United States v. Fagey.*

On July 9, 2002, Schneider participated in a proffer session attended by Conway, AUSAs Gary Brown and Demetri Jones, an FBI agent, and an SEC attorney. According to Druker, Schneider "told the Government ... exactly what he later testified to at trial." Druker maintains that after hearing Schneider's version of events, the government attorneys agreed that the prosecution should not go forward, and the parties agreed to pursue an adjournment of the July 22 trial date so that the prosecutors could seek permission to dismiss or grant a deferred prosecution. Druker further asserts the prosecutors later informed him they drafted a memorandum urging these options on their superiors. The government eventually decided to pursue the case against Schneider, however. The trial lasted from October 16–24, 2002.

## C. Trial Testimony

Skulsky testified that he discussed with Schneider IMN's use of the float to pay the haircut and operating expenses. Moreover, Skulsky testified that, during 1999, when Schneider was "doing the internal auditing for the company," IMN "set aside an office for him to work in, and he worked in the conference room next to [Skulsky's] office as well."

Casuccio's testimony also supported the case for Schneider's knowledge of the fraud. Casuccio testified that Schneider was in attendance at a meeting where the IMN project was explained to Chaitovsky. At this meeting, Casuccio "wanted the new auditing firm to understand that there were problems at Island Mortgage," and so he "said to [Chaitovsky] that Island was not paying its two percent haircut on the closing of the mortgage, and that those funds were winding up in Island's account when the loans sold, and that the—this obligation to the ... escrow account, attorney account, whichever, which they were all called, were then assigned to the Skulsky Trust and it was reflected on the financial statements as a debt to the Skulsky Trust." Casuccio asserted as well that he explained to Schneider that the liability due the Skulsky Trust "rose out of the two percent haircut," and that he and Schneider "were trying to ascertain whether or not that two percent could in fact have grown to the number that it grew to and could the float have been that high." He and Schneider performed calculations to attempt to determine the amount of the float.

Chaitovsky related a discussion in which Schneider explained to him the mechanics of how IMN avoided its obligation to fund the haircut. Chaitovsky testified that "early on in the audit," Schneider explained that the two percent of the mortgage not funded by the warehouse lender "is originally recorded as a haircut payable, which is the amount they are supposed to fund." Apparently still explaining what Schneider told him, Chaitovsky continued: "And then they immediately make an entry that removes the haircut payable and shows it as amount due the Skulsky Trust. So I understood that the Skulsky Trust was—represented those haircut payables that they weren't funding, among other things, but that was the majority of what was in there." Chaitovsky also described a meeting that he, Schneider, and Casuccio attended, where Chaitovsky "questioned why are all these escrow agents letting you not pay this amount that you owe." Chaitovsky stated that at this meeting, the liability to the Skulsky Trust was explained as "a net amount pretty much owed to the escrow agents that the Skulsky Trust is taking on."

Henry DiMeglio, a junior accountant from Citrin, testified that he, Schneider, and another Citrin accountant had a dis-

cussion "about how the liabilities to either the escrow agents or the loan warehouses could grow to such an enormous size without requiring somebody screaming for repayment."

Schneider testified in his own defense, denying any knowledge of or participation in the fraud. Schneider said that, upon learning of the Skulsky Trust account, he went to Casuccio, who explained to him falsely that the Skulsky Trust was loaning to IMN the money necessary to fund the haircut. According to Schneider, Casuccio stated that the Skulsky Trust beneficiaries and the Skulsky Trust itself owned large stakes in IMN, and this explained their willingness to extend credit to IMN; they anticipated being repaid when the company was sold. Schneider testified that Casuccio's explanation, together with his statement that Casuccio would be auditing the Skulsky Trust account, satisfied Schneider that he did not need to pursue the matter further. Schneider maintained he was never aware that the money to fund the haircut, instead of coming from the Skulsky Trust, was in fact coming from the float on the escrow accounts. According to Schneider, at the initial meeting with Casuccio, Chaitovsky, and Schneider to discuss transferring the IMN account to Citrin, the Skulsky Trust was brought up, but the possibility of fraud or improprieties was never mentioned.

Patrick Lyons, a Werblin accountant, and Monica Stasko, Eisele's assistant, testified that they were unaware of any illegal activity at IMN or any participation by Schneider in the closed-door meetings that took place in 1999 and 2000 among Skuslky, Casuccio, and Eisele. Stasko testified that Eisele, Skulsky, Skulsky's brother, and Casuccio were part of an "inner circle" that Schneider was not a part of.

Schneider was acquitted after jury deliberations lasting three and one half hours.

### D. Post–Trial Proceedings

In November 2002, Schneider moved for attorney's fees and expenses pursuant to the Hyde Amendment, alleging that the government had based its decision to prosecute him not on the evidence, but on Avergun's animus, which arose from Schneider's refusal to sign the proffer agreement and to cooperate with prosecutors; and that the prosecution continued out of personal pique and in retaliation for Schneider's lawful exercise of his constitutional rights. He also asserted that the government had not properly investigated the case, relied on witnesses who were not credible, and gave a deferred prosecution to a more culpable participant, Chaitovsky, to secure his cooperative testimony, all out of its vindictive desire to harm Schneider. In addition, Schneider requested that the record be expanded to have the court review, *in camera,* the memorandum written by the AUSAs who had evaluated his case and who had offered an opinion on whether it should be tried, and to hold a hearing so those AUSAs could be cross-examined.

In August 2003, the government opposed the motion, submitting affidavits from Avergun and Sack. In Avergun's affidavit, she stated the following. As a result of her research into the case, she had concluded that Schneider was criminally liable for "his role in auditing the books of IMN and in managing the transition of the IMN account from Werblin to Citrin Cooperman." Moreover, she asserted that her decision to present an indictment to the grand jury had nothing to do with Schneider's choice not to participate in the proffer session; rather, she honestly believed that the government's witnesses and documents established that Schneider knew or should have known that the accounting records

submitted by IMN were materially false and misleading. She further stated that, after leaving the Eastern District United States Attorney's Office in January 2002, she was not in touch with anyone from that office regarding the Schneider prosecution until July 2002 when AUSA Jones informed her that Schneider had participated in a proffer session and was seeking dismissal or deferred prosecution. She offered her opinion to Jones and to Sack that "such a disposition would be inappropriate." Though she continues to believe that Schneider was guilty of the offenses charged, she "never harbored any animus toward him and never acted out of bad faith."

In his affidavit, Sack averred that, after discussing the case with Druker, he determined that an indictment should be presented to the grand jury. After Avergun left the office, he communicated with the AUSAs handling the case, as well as with Avergun, in order to determine the appropriate course of action. He then decided that the case should proceed to trial based on his belief that the evidence showed that Schneider was guilty of the offenses charged. He asserted that he never harbored any animosity toward Schneider, nor had he acted out of bad faith, and expressed his view that Avergun was pursuing the prosecution because she sincerely believed in Schneider's guilt and that the evidence was sufficient to establish his guilt at trial.

In a thorough memorandum and order entered on November 3, 2003, the district court denied Schneider's motion. *United States v. Schneider,* 289 F.Supp.2d 328 (E.D.N.Y.2003). The district court found that Schneider had failed to prove, by a preponderance of the evidence, that his prosecution was frivolous, vexatious, or in bad faith within the meaning of the Hyde Amendment. Specifically, the court found

that the case was not frivolous because government witnesses had implicated Schneider in the crimes and, if their testimony was believed, he would have been convicted. The case was not vexatious because the government had more than adequate evidence to establish each element of the crimes and the jury's credibility determinations did not undermine the legal merit or factual foundation of the prosecution. In addition, the prosecution was not undertaken in bad faith because the instances cited by Schneider as evidence of Avergun's vindictiveness were, for the most part, not "germane" to the analysis.

With regard to Schneider's discovery request, the district court was skeptical of the government's position that the Hyde Amendment did not authorize compelled production of privileged government documents for review, and assumed that the "review may be undertaken if the appropriate threshold showing has been established." The district court found that Schneider had not met that threshold.

Schneider filed a notice of appeal on November 13, 2003.

## ANALYSIS

This Circuit has not previously interpreted the Hyde Amendment. It was "enacted as part of P.L. 105–119, the $31.8 billion Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act of 1998, and is found as a statutory note to 18 U.S.C. § 3006A." *United States v. Gilbert,* 198 F.3d 1293, 1298 (11th Cir.1999). It provides:

During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act [Nov. 26, 1997], may award to a

prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code. To determine whether or not to award fees and costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal. Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation. No new appropriations shall be made as a result of this provision.

Pub.L. No. 105–119, § 617, 111 Stat. 2440, 2519.

We first consider Schneider's claim for attorney's fees and expenses, and then analyze his claim that the Hyde Amendment required the district court to review certain government material *ex parte* and *in camera*.

### A. Claims For Attorney's Fees and Expenses

Schneider argues on appeal that his prosecution was vexatious, frivolous, and in bad faith mainly because the evidence of his guilt was insufficient. He contends that the primary witnesses testifying against him lacked credibility. He also asserts that the government's failure to dismiss the prosecution despite the dismissal recommendation of the attorneys assigned to the case; and Avergun's behavior relating to the proffer session, including her alleged threat to indict Schneider if he asserted his Fifth Amendment rights before the grand jury, only strengthen his argument that the government should be held liable under the Hyde Amendment.

We are called on to interpret and apply statutory language providing that the court "may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith." Pub.L. No. 105–119, § 617, 111 Stat. 2440, 2519. At bottom, our task is to be faithful to legislative meaning, consistent with the legislative purposes that guided Congress in enacting the statute—to penalize government for prosecutorial abuses and to deter such inappropriate conduct. In this case, we need not parse the precise meaning of the words "vexatious," "frivolous" and "in bad faith" because, as will be developed below, Schneider's case clearly falls short of the type of abusive prosecutorial conduct that would trigger Hyde Amendment liability. It may be that some future case may require such an exegetical exercise, but we need not and do not engage in it here. That said, we note that the dictionary definitions of the particular words at issue are consonant with our determination here that the Hyde Amendment does not provide Schneider the relief he seeks.[3]

---

**3.** The Sixth Edition of *Black's,* which was the current edition at the time of the Hyde Amendment's passage, defines the word "vex- atious" as "[w]ithout reasonable or probable cause or excuse." *Black's Law Dictionary* 1565 (6th ed.1990). The third edition of *Web-*

■ We cannot accept Schneider's argument that the government's prosecution of him was vexatious, frivolous, or in bad faith because of the insufficiency of the evidence. The government's witnesses here directly implicated Schneider in the crime. Chaitovsky testified that Schneider gave him a virtual primer on how IMN avoided its obligation to fund the haircut.[4] Skulsky declared that he discussed with Schneider IMN's use of the float to fund loans, and Casuccio stated that Schneider was in attendance at a meeting where Casuccio explained the essence of the fraudulent scheme to Chaitovksky. Indeed, defense counsel acknowledged as much in the defense summation: "If you believe Mr. Casuccio that they were all talking about the float and that he told [Schneider] in some words or manner that there was fraud going on and if you believe him beyond a reasonable doubt, then you are going to convict [Schneider]." At oral argument, counsel for Schneider again admitted that the thrust of Schneider's Hyde Amendment argument rested on the credi-

bility of the witnesses arrayed against him. Of course, these witnesses had shortcomings; Skulsky had a prior criminal record, and Skulsky, Casuccio, and Chaitovsky each played a central role in the dishonest scheme they were discussing. However, as the district court pointed out, the government is "often saddled with" imperfect witnesses, requiring juries to "sift through" and evaluate the testimony despite these shortcomings. 289 F.Supp.2d at 331. In this case, the shortcomings of witnesses who directly implicated Schneider in the crime are inadequate to show that the government lacked a reasonable legal basis for prosecution.

Ultimately, Schneider's argument concerning the sufficiency of the evidence appears to us to be based on the result—his acquittal—from which he extrapolates backwards and concludes that the case had no merit. However, as the Ninth Circuit has remarked,

[t]he trial process is fluid and involves multiple strategic and evidentiary deci-

---

ster's defines "vexatious" as "causing or likely to cause vexation," or "lacking justification and intended to harass." *Webster's Third New International Dictionary* 2548 (3d ed.1993). *Black's* defines a "frivolous" pleading as one "clearly insufficient on its face," and a "frivolous" claim as one for which a proponent "can present no rational argument based upon the evidence or law in support of that claim." *Black's Law Dictionary* 668. *Webster's* defines "frivolous" as "of little weight or importance," and "having no basis in law or in fact." *Webster's Third New International Dictionary* 913. "Bad faith" is, according to *Black's*, "not simply bad judgment or negligence, but rather [implying] the conscious doing of a wrong because of dishonest purpose or moral obliquity." *Black's Law Dictionary* 139. The third edition of *Webster's* includes no definition for the term, although the second edition defines it as "[t]reachery under guise of fidelity." *Webster's Second New International Dictionary* 203 (2d ed.1953).

**4.** Schneider insists that Chaitovsky perjured himself by testifying that Schneider attended a critical meeting, and that Schneider showed this conclusively by testifying that he was actually in Minnesota during the week of the meeting. Chaitovsky testified that at the meeting in question, Casuccio stated that the debt to the Skulsky Trust was "a net amount pretty much owed to the escrow agents that the Skulsky Trust is taking on that they are going to pay." Even if Schneider did not attend this particular meeting, Chaitovsky also testified that Schneider himself later gave a similar explanation of the debt to the Skulsky Trust. In addition, differing recollections regarding people's attendance at one of multiple meetings concerning the IMN engagement could easily be an indication of a simple mistake, rather than dishonesty. Most importantly, Schneider has introduced no evidence concerning the critical issue for Hyde Amendment purposes: whether the government was aware of the alleged inaccuracy in Chaitovsky's testimony when it chose to pursue the prosecution.

sions, many of which cannot be predicted at the outset, and many of which depend on contested evidentiary and other trial rulings—not to mention the uncertainties associated with witnesses' testimony. The trial process also implicates judgment, strategy, and prosecutorial discretion. This is not to say that prosecutors may operate without limits, but simply that the test for awarding fees under the Hyde Amendment should not be an exercise in 20/20 hindsight . . . .

*Sherburne*, 249 F.3d at 1127. An acquittal, without more, will not lead to a successful Hyde Amendment claim, as it was Congress's intent to "limit Hyde Amendment awards to cases of affirmative prosecutorial misconduct rather than simply any prosecution which failed." *Knott*, 256 F.3d at 29. Similarly, the facts that the jury was out for only three and a half hours, and that Schneider's counsel informs us certain jurors expressed to him anger that Schneider had been prosecuted, do not alter our view that the government had multiple witnesses directly implicating Schneider.

█ Schneider posits that the government's bad faith was demonstrated by the events surrounding the proffer session, during which Avergun allegedly: (1) became incensed when counsel told Schneider not to engage in the proffer session; (2) advanced the questionable claim that certain language in the proffer agreement was mandated by the Second Circuit; (3) improperly addressed him directly; (4) threatened to indict him if he asserted his Fifth Amendment rights before the grand jury; and (5) refused counsel's offer to accept service on Schneider's behalf. He adds that bad faith should be presumed from Avergun's insistence that the trial be pursued despite the recommendation of attorneys on the case that the government dismiss charges against Schneider or grant him a deferred prosecution, and from the government's "absurd and unwarranted" deal with Chaitovsky in return for testifying against Schneider. Schneider also complains of the government's failure to interview witnesses, such as DiMeglio, whose testimony supported Schneider's version of events.

█ Schneider mistakenly attempts to cast a contentious and hard-fought bargaining session as evidence of bad faith. The government's response to Schneider's refusal to proffer was consistent with the kind of "hard bargaining" in which both prosecutors and defense counsel routinely engage. The government's approach to the proffer negotiations may have been aggressive, but it was not taken in bad faith. Even if we were to conclude that Avergun's alleged vow to indict Schneider if he invoked the Fifth Amendment—a vow Avergun specifically denies having made—was inappropriate, it would still be, without more, merely evidence of vigorous negotiating by the government, rather than personal animus or dishonesty.[5] The

5. In support of his allegation that Avergun's statement was somehow inappropriate, Schneider cites *United States v. Sanders*, 211 F.3d 711 (2d Cir.2000) and *United States v. White*, 972 F.2d 16 (2d Cir.1992). However, both of these cases dealt not with pretrial negotiations, but with vindictive prosecution allegations, in which criminal defendants asserted that they had been prosecuted in retaliation for lawful exercises of their constitutional rights. *See Sanders*, 211 F.3d at 719;

*White*, 972 F.2d at 19. The Supreme Court has made clear that the law governing plea negotiations is different from the law of vindictive prosecution, and the former in fact grants the government greater latitude. In *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), the Court held that a prosecutor's demand that a defendant plead guilty in exchange for a five-year sentence recommendation or face an indictment that would expose the defendant to a life

memorandum recommending that Schneider's prosecution not be pursued, assuming it exists, would betray nothing more than that there was a difference of opinion within the United States Attorney's Office over whether to prosecute Schneider. Final responsibility for this decision rested with Sack, as the Chief of the Criminal Division, and he avers that it was in fact his decision, and not Avergun's. Schneider also argues that his two audit assistants believed he had no part in any fraud, and that the government's failure to interview them indicates bad faith. The Hyde Amendment does not impose on prosecutors a duty, once they have identified evidence sufficient to bring a prosecution, to cull the field for witnesses who might testify *on behalf* of the defendant. Finally, Schneider cites the government's decision to grant Chaitovsky a deferred prosecution as evidence of bad faith, arguing that Chaitovsky's culpability greatly exceeded Schneider's. Schneider asserts that the government only struck this deal out of its zeal to prosecute him at all costs. However, if the testimony of the government's witnesses had been credited, Schneider's culpability could easily have been viewed as equal to that of Chaitovsky. This is just the sort of judgment call that "gener-

ally rests within the broad discretion of the prosecutor." *United States v. Alameh,* 341 F.3d 167, 173 (2d Cir.2003).

■ Two aspects of the government's conduct call for some further comment. These are the AUSA's assertion to Schneider's attorney that language in the proffer agreement the government had proposed was "required by Circuit authority," and her subsequent statement to Schneider that "your attorney is making a very big mistake here." The first was inaccurate.

As for the AUSA's assertion to Schneider that his attorney "is making a big mistake," we think it was inappropriate for two reasons. Notwithstanding that the proffer session opened the door to direct communication between government counsel and the defendant, the AUSA remained Schneider's adversary, not his counsel. While it was appropriate in the context of the proffer session for the AUSA to ask Schneider questions to determine the possible usefulness of his testimony, the extent of his knowledge, his trustworthiness, and his good faith, it was not proper for the AUSA to act as Schneider's legal advisor, telling him where his best interests lay. Even less was it proper for the

---

sentence did not violate the defendant's due process rights. *Id.* at 358–60, 365, 98 S.Ct. 663. *See also United States v. Cruz,* 156 F.3d 366, 374 (2d Cir.1998) (noting *Bordenkircher's* holding regarding prosecutor's plea negotiations and applying similar rule to defendant's choice between proffering in order to seek relief from mandatory minimum sentence under U.S.S.G. § 5C1.2 and preserving his Fifth Amendment right not to incriminate himself); *United States v. Stanley,* 928 F.2d 575, 579 (2d Cir.1991) (applying *Bordenkircher*). Of

course, Schneider does not claim in his complaint that the prosecutor's threat to indict if he asserted his Fifth Amendment right before the grand jury violated his due process rights, and we do not rule on this issue. However, the wide latitude granted to prosecutors by *Bordenkircher* only confirms our view that Avergun's statement, if made, was not an extraordinary threat that might give rise to an inference of bad-faith animus, but simply evidence of aggressive bargaining by a prosecutor.

AUSA to seek to undermine Schneider's trust in his own attorney. The AUSA later apologized for this remark.

Once again, as no hearing was held, we cannot know whether these statements were bad-faith attempts to influence Schneider's legal representation, or simply instances of poor judgment. As to both episodes, it seems to us more likely they were innocent manifestations of bad judgment, rather than calculated malice or bad faith. Nonetheless, we must recognize the possibility that they were motivated by a bad-faith scheme to take advantage of the defendant. The question is then whether the district court erred in denying liability under the Hyde Amendment without holding a hearing to determine whether this conduct was taken in bad faith.

We conclude there was no error. There was no need to conduct a hearing to determine whether these errors were done in good or bad faith because they were too insignificant to form a basis for Hyde Amendment liability. We note that the statute does not allow an award for any instance of vexatious, frivolous, or bad-faith conduct. An award is allowed only where the court finds that *the position of* the United States was vexatious, frivolous, or in bad faith." Pub.L. No. 105–119, § 617, 111 Stat. 2440, 2519 (emphasis added). In so fashioning the statute, Congress intended to reserve liability for abusive conduct that was sufficiently significant to be found to characterize the position of the United States. We can infer that Congress did not intend to allow liability to be imposed for trivial instances of offending conduct. Congress left to the courts to draw the lines as to how serious the vexatious, frivolous, or bad-faith conduct would need to be to so characterize the "position of the United States." To resolve this case, we need

not go further than to say there must be substantial or significant vexatious, frivolous, or bad-faith conduct—more significant than the two rather trivial episodes we have discussed. Accordingly, there was no need for the district court to hold a hearing to determine whether the AUSA's two inappropriate remarks were motivated by bad faith, because even if they were (which we think unlikely) they were too insignificant to justify imposition of liability under the Hyde Amendment.

In short, we conclude that the indictment of a non-cooperating target of a grand jury investigation, where the government has solid evidence of guilt and there is no evidence of significant dishonest or abusive conduct on the government's part, is not "vexatious, frivolous, or in bad faith" within the meaning of the Hyde Amendment. *Id.* Consequently, we affirm the district court's ruling denying Schneider's motion for attorney's fees and expenses.

*B. Schneider's Claim of Entitlement to Production of a Government Memorandum*

■ As noted, the district court denied Schneider's motion without a hearing and without ordering the government to produce its memorandum allegedly recommending that the prosecution be dropped. The district court concluded that Schneider had failed to make any substantial threshold showing of entitlement to relief. Schneider contends the court should have ordered the government to produce the memorandum for *in camera* inspection. Schneider argues that he should be entitled in seeking to make his case for Hyde Amendment liability to the benefit of any information in that memo that might show that the government's position was vexatious or in bad faith.

The government contends the Hyde Amendment does not empower a court to order the production of materials in the government's possession. It argues that the clause that permits the court "for good cause shown [to] receive evidence *ex parte* and *in camera*," *id.*, is designed simply to protect the confidentiality of sensitive materials the government may rely on in its defense and does not imply any right in the criminal defendant to make his case for Hyde Amendment liability by the subpoena of government materials either for disclosure to the defendant or for *ex parte* and *in camera* inspection.

Courts analyzing this issue have reached differing conclusions. In *United States v. Gardner*, 23 F.Supp.2d 1283 (N.D.Okla. 1998), the District Court for the Northern District of Oklahoma rejected the government's contention that the language only allowed for court review "upon voluntary production by the Government in rebuttal of some *claim* by [the movant]." *Id.* at 1296 (emphasis added). The court concluded that "the Hyde Amendment vests in the Court both the responsibility and the authority to develop the facts in a manner warranted by the circumstances of the case for the purpose of determining whether the conduct of the United States was 'vexatious, frivolous, or in bad faith.' " *Id.* (quoting Pub.L. No. 105–119, § 617, 111 Stat. 2440, 2519). In *United States v. Truesdale*, 211 F.3d 898 (5th Cir.2000), the Fifth Circuit was more sympathetic to the government's position. After reviewing the legislative history of the provision, the court stated: "It appears the provision for in camera review of evidence was included to enable the government to defend itself against Hyde Amendment motions and at the same time protect confidential information. We do not read the Amendment as providing for discovery and a hearing as a matter of right." *Id.* at 907.

Although we have no need to resolve the question in this case and do not do so, we believe the position of the government, and the Fifth Circuit in *Truesdale*, may have merit. The statute's text contains no indication of intent to grant a court the authority to order the production of government materials. Various provisions of the Federal Rules of Criminal Procedure and the Federal Rules of Civil Procedure, which do give the court authority to order production, say so explicitly. *See, e.g.*, Fed.R.Crim.P. 16(a)(1)(A), (B), (E); Fed. R.Civ.P. 26(b)(1), (3), (4). Each contains language mandating disclosure. The Hyde Amendment contains no such language. The statute does not state that the court may "order," "compel," or "require" the production of evidence, nor that a party may "obtain" disclosure.

Schneider contends we should find statutory authority for such an order in the clause providing that a court "for good cause shown, may receive evidence *ex parte* and *in camera*" in order "[t]o determine whether or not to award fees." Pub.L. No. 105–119, § 617, 111 Stat. 2440, 2519. He contends he has shown "good cause" because he cannot show the government's vexatious bad faith and his consequent entitlement to relief unless the government provides the court with a copy of its memo. The problems with this argument are two. First, the statute's authorization to the court to "receive" evidence *ex parte* and *in camera* says nothing about authorization to order its production. Second, the term "for good cause shown" relates only to the need for *ex parte* and *in camera* inspection to protect the confidentiality of sensitive government materials, not to the movant's need to acquaint the court with the government's materials in order to show entitlement to relief. The bill's legislative history indicates that the clause was added to address legislators' concerns that proceedings under the

Amendment might "compromise ... confidential sources or law enforcement techniques." *See* 143 Cong. Rec. H7793 (daily ed. Sept. 24, 1997) (statement of Rep. Lynn Rivers). In short, nothing in the words of the statute suggests that the court has the power to order the government to produce materials, either to the defendant or to the court, *ex parte* and *in camera.*

The district court entertained the possibility, without deciding, that an order of disclosure might be appropriate where the moving party had established a sufficient threshold of likelihood of liability. The court ruled, however, that Schneider had no such entitlement, having made no substantial showing. We need not decide whether, upon a sufficient threshold showing, a court may order the production of government materials either to the defendant, or to the court for *ex parte* and *in camera* inspection. Schneider, lacking evidence that even raised a likelihood of government liability, hoped to make his case by requiring the government to disclose its confidential materials to the court. We are confident that in such circumstances, the Hyde Amendment does not compel such production. The district court was at the very least within its discretion in refusing to order disclosure. *See United States v. Lindberg,* 220 F.3d 1120, 1126 (9th Cir. 2000) (applying abuse of discretion standard to district court determination under Hyde Amendment *ex parte* and *in camera* review provision); *United States v. Truesdale,* 211 F.3d 898, 906–07 (5th Cir.2000) (same); *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 937 (2d Cir.1998) (reviewing discovery rulings for abuse of discretion). For these reasons, we affirm the district court's refusal to order production of the prosecutors' memorandum.

## CONCLUSION

For the foregoing reasons, the order of the district court is AFFIRMED.