**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-4242**

───────────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

SHANNON MICHELLE DRAKE,

Defendant – Appellant.

───────────────

Appeal from the United States District Court for the Middle District of North Carolina at Greensboro. William L. Osteen, Jr., District Judge. (1:16−cr−00205−WO−2)

───────────────

Argued: January 27, 2023                          Decided: March 31, 2023

───────────────

Before GREGORY, Chief Judge, WILKINSON, and HEYTENS, Circuit Judges.

───────────────

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Gregory and Judge Heytens joined.

───────────────

**ARGUED:** Claire J. Rauscher, WOMBLE BOND DICKINSON (US) LLP, Charlotte, North Carolina, for Appellant.  Gregory Schaffer Knapp, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** David A. Hubbert, Deputy Assistant Attorney General, S. Robert Lyons, Chief, Criminal Appeals & Tax Enforcement Policy Section, Katie S. Bagley, Joseph B. Syverson, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Sandra J. Hairston, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

───────────────

WILKINSON, Circuit Judge:

Shannon Drake seeks an award of attorney's fees under the Hyde Amendment, Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (codified at 18 U.S.C. § 3006A note), following the district court's dismissal of the government's criminal case against her. She argues that her prosecution satisfied the Hyde Amendment's criteria for fee shifting because it was vexatious, frivolous, and in bad faith. She also requests discovery to support her claim. The district court denied discovery and denied attorney's fees based on its review of the evidence available to the government when it initiated Drake's prosecution. The appeal here challenges the district court's exercise of discretion at every turn. Because we think the district court acted within its discretion throughout, we shall affirm the judgment.

I.

A.

This appeal arises out of the prosecution of Bruce Gregory Harrison III for tax crimes and bank fraud. Harrison, who owned a temporary-staffing business in North Carolina named Compensation Management, Inc. (CMI), was convicted of tax crimes resulting from his failure to pay payroll taxes on behalf of his employees. *See United States v. Harrison*, 541 F. App'x 290, 291–92 (4th Cir. 2013). Harrison instead used the withheld payments for personal expenses to fund his lifestyle. *Id.*

Harrison also engaged in a "factoring" loan scheme involving funding that he and companies controlled by him received from GrandSouth Bank in South Carolina. In a factoring arrangement, companies sell their accounts receivable (debts owed to them by their customers) to a "factor," often a bank. In exchange, the factor loans the company a

2

cash advance that is repaid over time as the factor collects the accounts receivable. The factor typically charges interest and receives a commission.

The factoring scheme involved Harrison establishing certain "nominee" companies that appeared on paper to be controlled by other individuals but were actually controlled by him. GrandSouth factored accounts receivable "under the false pretense" that it "would be factoring the accounts receivables of the Nominee Companies when, in fact, the Nominee Companies did no staffing business, had no actual receivables, and the invoices being factored belonged to CMI." J.A. 115. The factoring loans were paid to the nominee companies but were ultimately directed back to Harrison. Harrison's contacts at GrandSouth were Douglas Corriher, head of the factoring department, and Shannon Drake, the employee who managed Harrison's factoring loans.

After Harrison's trial for payroll-tax fraud, a grand jury investigated GrandSouth's banking practices in connection with Harrison's factoring arrangements. The investigation developed evidence that GrandSouth officers and employees helped Harrison use his nominee companies to circumvent legal lending limits on the amount that GrandSouth could loan to any single borrower. Harrison wanted a credit line of about $10 million, which greatly exceeded the legal limit. So Harrison and GrandSouth entered several smaller factoring agreements, each in the name of a company nominally controlled by one of Harrison's associates but actually controlled by Harrison, which collectively exceeded the legal limit. GrandSouth did not disclose Harrison's interest in these arrangements to bank examiners.

3

Drake's role in this scheme was more than tangential. As the district court later found, she was "involved in or in fact administratively executed many of the criminal transactions." *Id.* at 6609–10. She was responsible for reviewing account credit limits and communicated directly with CMI. Drake routinely made entries into GrandSouth's records that were "material and, for the most part . . . false" because they concealed Harrison's interest in the factoring arrangements. *Id.* at 6618. The entries indicated that accounts receivable and factoring loans were associated with the nominees when they in fact belonged to Harrison and CMI. They did not reflect the "true nature of the [nominee companies'] corporate officers and structure" and "reflected distributions to and for the benefit of the nominee companies when in fact those distributions were often made to, and for the benefit of, Harrison." *Id.*

Two GrandSouth employees testified before the grand jury about how Drake helped Corriher conceal the fraudulent nature of Harrison's factoring loans.[1] One of Drake's coworkers, C.G., testified that Drake and Corriher had a "very" close working relationship and often discussed Harrison's factoring arrangements. *Id.* at 4542–43. C.G. testified that after Corriher became aware of an investigation, he directed Drake "to pull every single

---

[1] We refer to grand jury testimony only to the extent necessary for public understanding of the decision's rationale. "[P]ublic access" to judicial proceedings "promotes not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary." *Doe v. Pub. Citizen*, 749 F.3d 246, 266 (4th Cir. 2014). Shielding judicial reasoning "from public view makes the ensuing decision look more like a fiat and requires rigorous justification." *Id.* (quotation marks omitted). While Fed. R. Crim. P. 6(e) protects grand jury secrecy, it gives courts "substantial discretion," *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 221, 223 (1979), to "authorize disclosure" of grand jury material "in connection with a judicial proceeding," Fed. R. Crim. P. 6(e)(3)(E).

4

box of all those staffing companies and pile them up and shred them. . . . [t]he less hands that touch these files, the better." *Id.* at 4544. C.G. observed Drake shredding those documents in a "hush-hush" manner. *Id.* at 4545. Another coworker, Y.S., testified that the wire transfer form that Drake used for Harrison's factoring loans differed from GrandSouth's standard form because it listed multiple recipients, and that some of the practices related to Harrison's accounts appeared improper. *Id.* at 4608–09, 4618–20.

Relevant here, Drake testified before the grand jury earlier in its investigation. At the time, the government advised her that she was "purely a factual witness" and not a target or subject of the investigation. *Id.* at 4727–28. Drake was represented by the same law firm that represented GrandSouth, which would have been a potential conflict of interest had she been considered a target. But unbeknownst to Drake, AUSA Frank Chut had sent an email to investigating agents several weeks earlier that stated:

> We need to decide if we want to treat Shannon Drake as a target. . . . [S]he was an essential cog in [the loan factoring scheme] and was well aware that these loans were a nominee arrangement. It would help us to get her an attorney of her own. Give her a break in response for full testimony *or make her eat a false entry on bank books charge* (venue issues aside)?

*Id.* at 4290 (emphasis added). The North Carolina State Bar filed an ethics complaint against Chut in connection with this incident that remains pending.

B.

In June 2017, the grand jury charged Drake and Corriher with conspiracy, bank fraud, and misapplication of bank funds related to Harrison's factoring loans. Corriher pleaded guilty to conspiracy and agreed to cooperate. Corriher admitted that he helped Harrison "circumvent" federal lending limits by extending factoring loans to the nominee

5

companies. *Id.* at 6613. Corriher "was aware that [Harrison] was not paying over millions in payroll taxes . . . [and] that a borrower's unpaid payroll taxes generally constitute a grave risk to the lender," but Corriher "continued making advances on the factoring loans . . . because the fund of unpaid payroll taxes also served to enrich [the bank] by enabling [Harrison] to repay his loan." *Id.* at 6613–14. "The bank was able to collect high rates of interest on the loan advances along with lucrative fees." *Id.* at 6614. An August 2017 superseding indictment charged Drake and two other GrandSouth officers with bank fraud, misapplication of bank funds, and multiple conspiracies to make materially false bank-record entries—including those concealing lending-limit violations and the fact that some of Harrison's accounts receivable were uncollectible.

Before trial, Drake moved to dismiss the indictment and suppress her grand jury testimony because the government inaccurately told her she was neither a subject nor a target. The government then voluntarily produced AUSA Chut's email described above. The district court held that "it is reasonable to conclude that Ms. Drake and her counsel were readily misled by a representation that Ms. Drake was neither a target nor a subject of the investigation." *Id.* at 806. But the court did not suggest that "the prosecutor went so far as to intentionally commit these acts or to intentionally mislead." *Id.* at 808. It denied Drake's motion to dismiss because any misrepresentation was harmless, particularly given that the government did not plan to introduce Drake's grand jury testimony at trial.

As the district court recognized, Drake's conduct was right at the edge of being a jury question. At trial, the government produced evidence that Drake made and directed materially false entries in GrandSouth's books and records related to Harrison's scheme.

6

But there was less evidence presented as to whether Drake *knew* the entries were false such that she acted with a culpable mens rea. The government did elicit testimony that the wire request form that Drake used for Harrison's accounts differed from the standard GrandSouth form because it had extra space for additional authorization signatures. *See id.* at 2503–04 (testimony of Catherine Smith), 2993 (testimony of Cyndy Ayers). But the district court refused to allow the government to ask several other witnesses whether GrandSouth's factoring arrangement with Harrison deviated from standard practice. *See, e.g.*, *id.* at 1091–93. Moreover, the government did not call C.G. or Y.S. as witnesses.

At the close of the government's case, Drake moved for a Fed. R. Crim. P. 29 acquittal, arguing that there was insufficient evidence of any fraudulent intent to conceal Harrison's interest in the factoring arrangements or circumvent the bank's lending limit. The court granted acquittal on all counts. On the one hand, Drake's "participation in transactions related to these fraudulent schemes [was] substantial," as she "was [Harrison's] account representative" and signed many of the fraudulent documents. *Id.* at 3907–08. But the court's review of the trial evidence showed that "knowledge and intent [were] significant issues": There was "no evidence presented that anyone within the factoring department had or gave . . . Drake any reasonable basis upon which to suspect the companies were fake or that Drake ignored any obvious red flags," and there was no "sufficient basis upon which a jury could find that Drake even had subjective knowledge or suspicion that information that she was . . . logging into the systems was false." *Id.* at 3908–11.

7

Still, the court recognized that its ruling on the sufficiency of the evidence as to some of the counts was a "closer call." *Id*. at 3910. It acknowledged the possibility it had "made mistakes in evidentiary rulings," and stated that it "would have been compelled" to deny Drake's Rule 29 motion had the government presented testimony from C.G. at trial. *Id*. at 3912–13. Finally, the court "commend[ed] counsel for the Government for the manner in which they prosecuted this case." *Id*. at 3913.

C.

After her acquittal, Drake moved for attorney's fees and expenses pursuant to the Hyde Amendment. She asserted that her prosecution satisfied the statute's criteria because it was vexatious, frivolous, and in bad faith: The government (1) advanced "an erroneous legal theory to treat nominee lending as inherently fraudulent," (2) "made multiple inaccurate statements . . . about the nature of their prosecution" and "withheld exculpatory evidence," and (3) misrepresented to Drake that she was not a target or subject of the investigation. *Id.* at 6607–08. She also moved for discovery, requesting information related to the government's decisions to prosecute her and not to call C.G. and Y.S. at trial.

The district court denied both motions and held that the government's case was not vexatious, frivolous, or in bad faith. To begin, there "was certainly probable cause to believe Drake's actions satisfied the actus reus of 18 U.S.C. § 1005 [making false entries in bank records]": Drake made entries that were materially false in that they did not reflect Harrison's role as the true owner of the nominee companies and beneficiary of the factoring loans. *Id.* at 6618. While there was not substantial evidence *admitted at trial* as to Drake's mens rea—whether she "knew the entries were false and acted with the necessary intent"—

8

the government still had probable cause based on other evidence it had uncovered. *Id.* at 6618–19, 6622. C.G.'s grand jury testimony about Drake's shredding of files was "circumstantial evidence of knowledge of fraud and intent to defraud." *Id.* at 6622–23. Based on this testimony and "evidence of Drake's substantial participation in the transactions at issue," the "Government rightly concluded . . . that the evidence supported a finding of probable cause." *Id.* at 6623. The prosecution was therefore not "vexatious or 'groundless.'" *Id.* (quoting *In re 1997 Grand Jury*, 215 F.3d 430, 436 (4th Cir. 2000)).

Drake also failed to establish bad faith. The court found that Drake did not identify any "specific exculpatory evidence" that the government should have provided, and the government was not obligated to provide her with an assessment of the weight of the evidence against her. *Id.* at 6625–26. The government's inaccurate statement that Drake was not a target of the investigation was harmless because her testimony was never used at trial, and she identified no "legal harm she suffered as a result of [her attorneys'] alleged conflicts of interest." *Id.* at 6629–30. The court therefore declined to award attorney's fees.

Finally, the court denied discovery, concluding that the Hyde Amendment's text does not provide for it. *Id.* at 6631 (citing *United States v. Schneider*, 395 F.3d 78, 92 (2d Cir. 2005)). But even if it did have discretion to order discovery, the court held that Drake had not made a sufficient "showing suggesting that the Government pursued the charges for an improper purpose, in violation of the Hyde Amendment." *Id.* at 6632. The court found "no basis to conclude further discovery is required" given the "previously thorough and comprehensive discovery and presentation of evidence." *Id.* at 6633.

Drake timely appealed.

9

II.

The Hyde Amendment provides that a district court "may award" attorney's fees to a prevailing defendant in a criminal case if "the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust." 111 Stat. at 2519. The position of the United States is "vexatious" if the prosecution was "without reasonable or probable cause or excuse." *In re 1997 Grand Jury*, 215 F.3d at 436 (quotation marks omitted). "A frivolous action is groundless . . . with little prospect of success; often brought to embarrass or annoy the defendant." *Id.* (quotation marks omitted). Finally, "bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will." *Id.* (quotation marks omitted). The claimant bears the burden of establishing at least one of these elements, and we have characterized that burden as a "daunting obstacle" because "a lot more is required . . . than a showing that the defendant prevailed" in her criminal case. *Id.* (quoting *United States v. Gilbert*, 198 F.3d 1293, 1299, 1302 (11th Cir. 1999)).

In addition to the daunting obstacle imposed by the statute, we review a district court's decision to deny a Hyde Amendment motion only for abuse of discretion. *Id.* A district court abuses its discretion if its decision "is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (citation omitted).

Review of the district court's decision under the deferential abuse-of-discretion standard is particularly fitting in this context. The language of the Hyde Amendment allows for attorney's fees "where *the court finds* that the position of the United States was vexatious, frivolous, or in bad faith." 111 Stat. at 2159 (emphasis added). As the Supreme Court has recognized, "[t]his formulation . . . emphasizes the fact that the determination is for the district court to make, and thus suggests some deference to the district court upon appeal." *Pierce v. Underwood*, 487 U.S. 552, 559 (1988).

Moreover, questions like this one are "determination[s] that, as a matter of sound administration of justice," the district court "is better positioned than" an appellate court to make. *Id.* at 559–60 (quotation marks omitted). Whether the government's position was vexatious, frivolous, or in bad faith "will turn upon . . . what was the evidence regarding the facts," and the district court, by virtue of its unique position managing the case prior to and during trial, "may have insights not conveyed by the record[] into such matters as whether particular evidence was worthy of being relied upon." *Id.* at 560. Because the district court is more familiar with the parties' litigation conduct and the strength of the government's case, it is especially well-situated to determine whether a prosecution was vexatious, frivolous, or in bad faith. We therefore afford it substantial discretion in deciding Hyde Amendment claims.

The district court here acted well within its discretion when it concluded the prosecution was not vexatious, frivolous, or in bad faith.

11

A.

To begin, the district court correctly concluded that the prosecution was supported by probable cause. It was therefore not vexatious or frivolous. Contrary to Drake's suggestion, the court did not find probable cause based solely on the fact that Drake was indicted. Rather, the court assessed all the evidence available to the government when it decided to prosecute and held that the "Grand Jury and the Government *rightly* concluded . . . that the evidence supported a finding of probable cause." J.A. 6623 (emphasis added).

In determining whether there was probable cause for Hyde Amendment purposes, it was proper for the district court to consider the entirety of the evidence available to the government when it decided to prosecute. The court was not limited to evidence admitted at trial. As the First Circuit has recognized, in Hyde Amendment cases "the court must assess the basis for pursuing charges from the perspective of the government *at the time*" it made that decision. *United States v. Knott*, 256 F.3d 20, 35 (1st Cir. 2001). The statute uses the past tense—whether the government's position "*was* vexatious, frivolous, or in bad faith," 111 Stat. at 2519 (emphasis added)—which suggests that we must evaluate the government's position given the evidence available to it *when it decided to prosecute*. We agree that the "government was entitled to rely on its evidence so long as it had a good-faith basis for contending that the evidence was admissible," because an "interpretation of the Hyde Amendment which effectively requires the government precisely to anticipate later evidentiary rulings, where reasonable grounds for disagreement exist, is untenable in light of [the statute's] language and purposes." *Knott*, 256 F.3d at 35–36.

12

Given all the evidence available to the government when it decided to prosecute Drake, the prosecution was supported by probable cause. There was clearly probable cause with respect to the actus reus for the charged crimes. As the district court found, Drake made materially false entries in GrandSouth's books and records. The entries did not accurately reflect that "distributions to and for the benefit of the nominee companies" were actually "made to, and for the benefit of, Harrison" and that "the factoring lines were secured with receivables which were not actually owned or controlled by those nominee companies, but instead by Harrison." J.A. 6618.

With respect to Drake's mens rea—her knowledge of her entries' falsity or fraudulent intent to evade legal lending limits—there also was enough evidence to provide probable cause for her prosecution. The grand jury testimony of C.G., one of Drake's coworkers, that Drake surreptitiously shredded documents related to Harrison's staffing companies is the strongest evidence of Drake's culpable mens rea. C.G. testified that Drake said that "she shredded the files at the direction of Corriher [the head of GrandSouth's factoring department], after Corriher became aware of the investigation into the staffing companies." *Id.* at 6622. Drake wanted someone else to do the shredding, but Corriher told her that "[t]he less hands that touch these files, the better." *Id.* (quotation marks omitted). This testimony, which the grand jury found credible enough to provide probable cause, supports the proposition that Drake knew of and knowingly participated in the fraud.

It is true that the government ultimately chose not to call C.G. at trial due to potential credibility issues given the circumstances of her termination from GrandSouth and uncertainty regarding the scope of cross-examination that the district court would allow.

13

But the government was still entitled to rely on C.G.'s grand jury testimony when determining whether there was probable cause to prosecute Drake. *See Knott*, 256 F.3d at 35. The government could have believed in good faith that C.G.'s testimony would be admitted at trial and that it could successfully limit any damaging cross-examination. Indeed, the district court stated that had the government presented testimony from C.G., it "would have been compelled" to deny Drake's Rule 29 motion and allow the case to go to the jury, which presumably could have assessed C.G.'s credibility and decided to believe her. J.A. 3913. C.G.'s sworn grand jury testimony therefore supported the view that Drake acted with a culpable mens rea notwithstanding the government's later decision not to call her at trial.

In addition to C.G.'s testimony, other evidence available to the government supported probable cause. Two GrandSouth employees, Catherine Smith and Cyndy Ayers, testified at trial that Drake used a wire transfer form for Harrison's accounts that had a "bottom part . . . added for additional signatures" that "wasn't typical." *Id.* at 2504; *see id.* at 2993. A third employee, Y.S., testified before the grand jury about Drake's unusual practices with respect to Harrison's accounts, explaining that she never saw other "wires with multiple clients' names on it" and that it would not "be proper to lend to a nominee or fictitious entity." *Id.* at 4609–11. And Drake was familiar with the relationship between Harrison and the nominees, with emails showing her joking about all Harrison's "freakin' accounts" and directing CMI's clients to wire funds to the nominees' accounts. *Id.* at 2926–28, 5561.

14

Drake's use of abnormal forms and procedures, her knowledge of the nominee arrangements, and her creation of materially false records that concealed Harrison's role in the factoring loans constituted in their totality probable cause to conclude that Drake knew her entries furthered a fraudulent scheme. *See United States v. Bales*, 813 F.2d 1289, 1294 (4th Cir. 1987) ("Fraudulent intent may be established by circumstantial evidence and by inferences deduced from facts and situations."); *United States v. Krepps*, 605 F.2d 101, 109 (3d Cir. 1979) ("[A] jury may plausibly have determined that Krepps intended to deceive . . . when he omitted from the bank records any reference to his being the beneficiary of the loan.").

Finally, the fact that the district court granted Drake a Rule 29 acquittal does not undermine the proposition that the government's case was supported by probable cause. A Rule 29 acquittal does not require a grant of attorney's fees. The fact that Drake was acquitted means only that there was not sufficient evidence *admitted at trial* to prove her guilt *beyond a reasonable doubt*. *See* Fed. R. Crim. P. 29(a). Whether there was *probable cause* to conclude she committed a crime is, of course, a different and less demanding standard. *See Illinois v. Gates*, 462 U.S. 213, 235 (1983). And, as explained above, courts must determine whether the government had probable cause given *all* the potentially admissible evidence available to it when it decided to prosecute, not just the evidence actually admitted.

In fact, the court's statements with respect to the Rule 29 motion support a finding of probable cause here. The court characterized its Rule 29 holding with respect to charges related to the false entries as a "closer call" because the evidence could "potentially form[]

15

a basis for a finding by a jury of a willful blindness." J.A. 3910. If it was a close call whether a jury could find Drake guilty beyond a reasonable doubt based solely on the trial evidence, then it is likely the government had probable cause given all the available evidence. Moreover, the trial court's statement that it "would have been compelled to let this case go forward" had the government presented C.G.'s testimony implies that given that testimony, a jury could have found Drake guilty beyond a reasonable doubt. *Id.* at 3913. Given the district court's familiarity with the facts, we will not lightly contradict its judgment.

In sum, the government's prosecution of Drake was plainly not "vexatious." *In re 1997 Grand Jury*, 215 F.3d at 436. Probable cause likewise negates the possibility that the government's position was "frivolous." The case was not "groundless . . . with little prospect of success," and there is no evidence that it was "brought to embarrass or annoy the defendant." *Id.* (quotation marks omitted).

## B.

Nor did prosecutorial bad faith support an award of attorney's fees. On appeal, Drake contends that the court should have granted her motion because prior to her grand jury testimony, the government (1) falsely represented that she was not a target of its investigation, and (2) acquiesced in her being represented by the same counsel that was representing GrandSouth, creating a conflict of interest. Neither ground is persuasive.

First, the district court expressly declined to find that the government had acted in bad faith. There was no evidence that the government acted intentionally to mislead Drake. "[B]ad faith is not simply bad judgment or negligence." *Id.* (quotation marks omitted).

16

Because Drake had not shown that the government had a "dishonest purpose" or acted "affirmatively . . . with furtive design or ill will," she did not carry her burden to establish bad faith. *Id.* (quotation marks omitted). Moreover, the district court permissibly concluded that any inaccurate representation was harmless because the government did not introduce Drake's grand jury testimony at trial. *See* Fed. R. Crim. P. 52(a); J.A. 6628–29. Given that Drake was not prejudiced by any misrepresentation, the court acted within its discretion when it declined to award attorney's fees on this basis.

Second, the government's alleged acquiescence to Drake's representation by conflicted counsel does not support an award of attorney's fees. No evidence suggests that the government acted in bad faith—*i.e.*, that it had a "dishonest purpose" or intentionally refrained from pointing out a potential conflict that it had no hand in creating. *In re 1997 Grand Jury*, 215 F.3d at 436 (quotation marks omitted). And the district court again permissibly concluded that Drake was not prejudiced on account of being represented by GrandSouth's counsel before the grand jury. Her constitutional rights were not violated because there is no constitutional right to conflict-free counsel at grand jury proceedings, *United States v. Ayala*, 601 F.3d 256, 272 (4th Cir. 2010), and Drake did not show any other adverse consequences of being represented by conflicted counsel. The district court therefore did not abuse its discretion when it declined to award attorney's fees on the basis of prosecutorial bad faith.

### III.

Given the deficiency of Drake's allegations that the government's position was vexatious, frivolous, or in bad faith, the district court also did not abuse its discretion in

17

denying her motion for discovery. We note that some courts have suggested that the Hyde Amendment does not authorize district courts to order discovery at all. *See, e.g.*, *Schneider*, 395 F.3d at 91. Indeed, such discovery may potentially compromise prosecutorial decision-making and deliberation. But we need not decide this question. Even if the Hyde Amendment authorized discovery, we would review the district court's decision not to order it only for abuse of discretion. In this regard, the statutory language is permissive. *See* 111 Stat. at 2519 ("To determine whether or not to award fees and costs under this section, the court, for good cause shown, *may* receive evidence ex parte and in camera." (emphasis added)); *United States v. Truesdale*, 211 F.3d 898, 907 (5th Cir. 2000). The district court here did not abuse any such discretion.

By the time of Drake's motion for Hyde Amendment discovery, "volumes of discovery . . . ha[d] been provided and evidentiary hearings, including testimony, ha[d] been conducted" throughout the course of the litigation. J.A. 6632–33. But, as explained above, Drake still failed to show that the government's position was vexatious, frivolous, or in bad faith. The district court was intimately familiar with the evidence in this case and the government's litigation conduct. It did not abuse its discretion when it held that "[i]n light of the previously thorough and comprehensive discovery and presentation of evidence," there was "no basis to conclude further discovery [was] required." *Id.* at 6633.

## IV.

Given the significant evidence against her, Drake was fortunate to receive a Rule 29 dismissal from the court. As this case illustrates, such dismissals will not invariably result in an award of Hyde Amendment attorney's fees. Allowing awards as a matter of course

in such cases would contradict the limiting language of the statute and discourage the granting of such dismissals even when taking such action is the right thing to do.

For the foregoing reasons we affirm the judgment of the district court.

*AFFIRMED*